UNITED STATES of America,
Plaintiff–Appellee,

v.

Marc KRAMER, August Zona, Charles Clayton Stevens, Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

James J. MARREN, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Benjamin Barry KRAMER,
Defendant–Appellant.

Nos. 89–6229, 89–6240 and 90–5378.

United States Court of Appeals,
Eleventh Circuit.

Oct. 11, 1991.

Lawrence N. Rosen, Miami, Fla., for Marc Kramer.

Bradley R. Stark, Miami, Fla., for August Zona.

Kenneth M. Swartz, Asst. Federal Public Defender, Miami, Fla., for Charles Clayton Stevens.

William M. Norris, Miami, Fla., for James J. Marren.

Mary Catherine Bonner, Ft. Lauderdale, Fla., for Benjamin Barry Kramer.

Robert J. Bondi, Asst. U.S. Atty., Miami, Fla., for the U.S.

Before HATCHETT and DUBINA, Circuit Judges and CLARK, Senior Circuit Judge.

PER CURIAM:

Appellants, Benjamin Barry Kramer ("Ben Kramer"), Marc Kramer, James J. Marren ("Marren"), Charles Clayton Stevens ("Stevens"), and August Zona ("Zona"), appeal their sentences for attempting to effect Ben Kramer's escape from prison. Marren also appeals his conviction. For the reasons which follow, we affirm Marren's conviction and the appellants' sentences, but remand the case to the district court for disposition of certain ministerial matters.

## I. FACTUAL BACKGROUND

Ben Kramer and Marren were incarcerated together in the Williamson County Jail in Marion, Illinois, awaiting trial on related drug trafficking charges. In October 1988, Ben Kramer was found guilty of conducting a continuing criminal enterprise and conspiracy to distribute more than 1,000 pounds of marijuana, for which he was sentenced to life imprisonment without parole. Following the conclusion of the proceedings in Illinois, Ben Kramer was scheduled to be transferred to prison in Florida to face charges of RICO conspiracy, mari-

juana importation, and filing a false tax return.[1]

In late October 1988, Marren wrote two letters to Stevens, with whom Marren had worked prior to the events pertinent to this case. Marren asked Stevens to come to Illinois to see him in prison, advised Stevens that he should plan to go to Miami, Florida, after he visited Marren, requested that Stevens bring his pilot's license, informed Stevens that all of his expenses would be paid, and emphasized the importance of keeping their meeting a secret. After receiving Marren's letters, Stevens went to Illinois. During their visit, Marren pointed out Ben Kramer to Stevens as Kramer walked by. Marren also supplied Ben Kramer's brother, Marc, with a letter of introduction to Stevens.

Stevens met Marc Kramer in Illinois, and they then traveled together to Miami, where they began to plan Ben Kramer's escape from prison and transport to Columbia. While in Miami, Stevens took reconnaissance photographs of prisons where Ben Kramer was likely to be held awaiting trial, began looking for a helicopter, and began taking lessons to learn to fly a helicopter. All of his expenses were paid by Marc Kramer. Stevens eventually located and purchased a helicopter and a twin-engine airplane. The plane sustained wing damage during a routine maintenance operation, so he purchased a second plane. Stevens paid for the aircraft with approximately $135,000 in cash provided to him by Marc Kramer. Stevens continued to take flying lessons from the initial planning stages of the escape until the plan was put into effect. Marc and Ben Kramer maintained telephone contact during this time, often utilizing coded phrases in their conversations.

After Ben Kramer was tried and sentenced in Illinois, he was transported to Florida to face trial. He was held in E Unit at the Metropolitan Correctional Center in Miami ("MCC").

The plan developed by the appellants called for Ben Kramer to be lifted out of MCC by helicopter.[2] Stevens was to fly the helicopter to the prison and land in the exercise yard, where Ben Kramer would be waiting. Stevens was to then fly him to a nearby car containing a false compartment in which he would be hidden. Zona, an employee of a business owned by Ben Kramer, was scheduled to drive the car to a safe house Zona had rented in Crystal River, Florida. The twin-engine airplane, which had been fitted with extra fuel tanks, was located near the safe house. As the final part of the escape, Stevens was to fly Ben Kramer to Columbia.

On April 17, 1989, Ben Kramer spoke by telephone with Marc Kramer. Marc Kramer then telephoned Stevens and directed him to put the plan into action. Stevens flew the helicopter to MCC and landed in the E Unit exercise yard. Ben Kramer was able to get into the helicopter, but as it lifted off, the helicopter began to spin, its tail hit the concertina wire, and it catapulted over the fence, crashing in the prison grounds outside the exercise yard. Both Ben Kramer and Stevens suffered extensive injuries in the crash.

## II. PROCEDURAL HISTORY

The appellants were indicted for conspiracy to effect the escape of an inmate in violation of 18 U.S.C. § 371 (Count 1). In addition, Ben Kramer was charged with attempting to escape from the custody of the Attorney General in violation of 18 U.S.C. §§ 751(a) and 2 (Count 2), and the other four appellants were charged with aiding and assisting Ben Kramer's attempt to escape from custody in violation of 18 U.S.C. §§ 752(a) and 2 (Count 3). A superseding indictment also charged Ben Kramer with obtaining a helicopter to facilitate his escape from prison in violation of 18 U.S.C. §§ 1791(a)(2) and 2 (Count 5), and the remaining four appellants with provid-

---

1. Ben Kramer was convicted of the charges against him in Florida, for which he received a forty-year sentence. He was also sentenced to five years in prison in a separate case for possession of a weapon by a convicted felon.

2. The only possible place for a helicopter to land in MCC's E Unit was the exercise yard, which was approximately forty-seven feet wide and surrounded by a chain link fence topped with concertina wire.

ing a helicopter to Ben Kramer in violation of 18 U.S.C. §§ 1791(a)(1) and 2 (Count 4).

Marc Kramer and Zona pled guilty to Counts 1, 3, and 4 and Counts 1 and 3, respectively, pursuant to written plea agreements. Stevens pled guilty to Counts 1 and 4 pursuant to a plea agreement in which he agreed to testify for the United States. Marren proceeded to trial and was convicted on Counts 1, 3, and 4. Thereafter, Ben Kramer pled guilty to Counts 1, 2, and 5.

The United States sought upward departures from the Sentencing Guidelines for all appellants except Zona.[3] Each appellant except Stevens filed objections to his Presentence Investigation Report ("PSI"). Marc Kramer, Marren, and Zona were sentenced together, but separate sentencing hearings were held for Stevens and Ben Kramer, each of whom adopted the testimony presented and arguments raised at the sentencing hearing of their co-conspirators.

The district court determined that the Base Offense Level for each appellant was 13. U.S.S.G. § 2P1.1. It then announced the following upward departures applicable to all appellants:

*+ 1 level* for property damage. Testimony adduced by the government indicated damage to the MCC fence valued at $4,000–$6,000. The appellants presented testimony indicating that the damage was substantially less. The district court gave the appellants the benefit of the doubt and departed on the basis that the damage was less than $1,000.

*+ 2 levels* on the basis of more than minimal planning. The district court found that the appellants engaged in elaborate preparations for the escape attempt.

*+ 3 levels* for disruption of government function. The district court found that the attempted escape created an extensive disruption for MCC.

*+ 4 levels* for endangering public welfare and safety. The district court found that the helicopter's landing in the E Unit sig-

nificantly endangered several persons, including other inmates, in and around the area.

The district court also found that the factors on which it based its upward departures were not adequately taken into consideration by the Sentencing Commission, which did not contemplate a helicopter's flying into a correctional facility to extricate a prisoner.

■ The district court made certain adjustments as to individual appellants, calculated a total offense level and criminal history category for each, and sentenced each appellant as follows:

Ben Kramer:

| Base Offense Level: | 13 | |
|---|---|---|
| | + 4 | levels for his role as an organizer of an extensive criminal activity |
| | − 2 | levels for acceptance of responsibility |
| | +10 | levels applied to all appellants |
| Total Offense Level: | 25 | |
| Criminal History Category | V | |

Sentence imposed: 60 months each on Counts 1 and 2, plus 5 months on Count 5, to be served consecutively to the extent necessary to produce a total period of incarceration of 125 months. This prison term was also consecutive to the other sentences he was already serving. In addition, the court imposed 3 years supervised release, a fine of $100,000, and a $150 special assessment.

Marc Kramer:

| Base Offense Level: | 13 | |
|---|---|---|
| | + 4 | levels for his role as an organizer of an extensive criminal activity |
| | + 2 | levels for obstruction of justice[4] |
| | + 10 | levels applied to all appellants |
| Total Offense Level: | 29 | |
| Criminal History Category | I | |

---

**3.** As part of Zona's plea agreement, the United States agreed not to seek upward departures.

**4.** The district court found that Marc Kramer had accepted responsibility for his crime, but denied a downward adjustment on that basis

Sentence imposed: 45 months each on Counts 1 and 4 to be served consecutively, plus 3 years supervised release and a $100 special assessment. Count 3 was dismissed.[5]

Marren:

| | | |
|---|---|---|
| Base Offense Level: | 13 | |
| | − 2 | levels for his minor role in the offense |
| | + 2 | levels for obstruction of justice [6] |
| | +10 | levels applied to all appellants |

Total Offense Level: 23
Criminal History Category IV

Sentence imposed: 24 months each on Counts 1, 3, and 4 to be served consecutively, plus 3 years supervised release and a $150 special assessment.

Stevens:

| | | |
|---|---|---|
| Base Offense Level: | 13 | |
| | + 2 | levels for his major role in the offense |
| | − 2 | levels for acceptance of responsibility |
| | +10 | levels applied to all appellants |

Total Offense Level: 23
Criminal History Category I

Sentence imposed: 30 months each on Counts 1 and 4 to be served concurrently, plus 3 years supervised release and a $100 special assessment.

Zona:

| | | |
|---|---|---|
| Base Offense Level: | 13 | |
| | − 2 | levels for acceptance of responsibility |
| | +10 | levels applied to all appellants |

Total Offense Level: 21
Criminal History Category I

because it also found that Marc Kramer had threatened Stevens and thereby had obstructed justice. An adjustment under the guidelines for acceptance of responsibility is not warranted when a defendant's conduct results in an enhancement for obstruction of justice. U.S.S.G. § 3E1.1, Application Note 4.

**5.** One of the issues raised by Marc Kramer on appeal is that the district court dismissed the

Sentence imposed: 19 months each on Counts 1 and 3 to be served consecutively, plus 3 years supervised release and a $100 special assessment.

### III. MARREN'S CONVICTION

Marren contends that the evidence presented at trial was insufficient to support his conviction. Sufficiency of the evidence is a question of law subject to de novo review by this court. *United States v. Christopher*, 923 F.2d 1545, 1553 (11th Cir.1991). In assessing the sufficiency of the evidence, this court must determine whether a reasonable trier of fact could find that the evidence, considered as a whole and in the light most favorable to the United States, established the defendant's guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984).

We have reviewed the record in this case and find that the evidence presented at Marren's trial was clearly sufficient to establish his guilt. Marren's testimony regarding his interpretation of the letters he wrote and the reason he sent for Stevens was implausible, and it was not unreasonable for the jury to reject it. We decline, therefore, to disturb the verdict of the jury.

### IV. APPLICATION OF THE UNITED STATES SENTENCING GUIDELINES

Appellate review of departure cases consists of the following three steps:

First, we will determine whether the guidelines adequately consider a particular factor so as to preclude a district court from relying upon it as a basis for

wrong count. The United States agrees that the dismissal of Count 3 was error, and that Count 4 should have been dismissed instead.

**6.** The district court found that Marren had obstructed justice because his testimony at trial had been false or misleading and he had tried to bribe Stevens.

departure. We exercise de novo review of this question of law. Second, we must determine whether there exists sufficient factual support for the departure. This review implicates the district court's fact-finding role and we are constrained from reversing its findings except for clear error.... Finally, "once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness." In this vein, we must be mindful of "the factors to be considered in imposing a sentence ... and evaluate these in light of "the reasons for the imposition of the particular sentence as stated by the district court[.]" [Appellate courts are also required] to "give due regard to the opportunity of the district court to judge the credibility of the witnesses ... and [to] give due deference to the district court's application of the guidelines to the facts."

*United States v. Weaver*, 920 F.2d 1570, 1573 (11th Cir.1991) (citations and footnotes omitted).

## A. *Departures applicable to all appellants*

We begin our review of the appellants' sentences with the district court's departures applicable to all appellants.[7] The district court's decision to depart upward a total of ten levels for each appellant resulted in sentences of approximately three times the guideline range for all appellants except Stevens. Due to Stevens' cooperation with the United States, his sentence was approximately two times the guideline range. All of the appellants assert that the district court's departures for property damage, extensive planning, disruption of a governmental function, and risk of injury were erroneous. They argue that all are inherent in an escape attempt, and that the base offense level must have taken these factors into consideration. We find no merit to the appellants' arguments.

7. The district court explained its decision to depart upward in this case in terms of adjust-

### 1. *Damage to government property*

■ U.S.S.G. § 5K2.5 states as follows: If the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent to which the harm was intended or knowingly risked and on the extent to which the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction.

U.S.S.G. § 2P1.1, which provides the base offense level applicable to an escape or attempted escape from prison, does not take damage to a prison facility into consideration. Pursuant to U.S.S.G. § 2B1.1(b)(1)(B), which provides for a one-level increase for property loss greater than $100 and less than $1,000, the district court departed upward one level for the property damage caused by the crash. The record clearly indicates that the escape attempt caused at least $100 in property damage. Accordingly, we find this departure reasonable.

### 2. *More than minimal planning*

■ More than minimal planning is defined as "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 1B1.1, Application Note 1(f). More than minimal planning also exists "if significant affirmative steps were taken to conceal the offense." *Id.* The attempt to free Ben Kramer involved a six-month conspiracy, five participants, a helicopter, an airplane fitted with extra fuel tanks, a car with a secret compartment for hiding, a safe house, coded messages, and hundreds of thousands of dollars. We are persuaded that the planning involved in this escape attempt via helicopter from the prison recreation yard was well beyond the contemplation of the Sentencing Commission, and that there is ample factual support in the record evidencing the extensive planning which this undertaking required.

ments to the appellants' base offense levels for each departure factor.

Thus, application of the two-level increase was reasonable under the circumstances. Throughout the guidelines, if more than minimal planning is considered a specific offense characteristic, a two-level upward adjustment is recommended. *See, e.g.,* U.S.S.G. §§ 2A2.2(b)(1), 2B2.2(b)(1), 2F1.1(b)(2).

### 3. *Disruption of governmental function*

U.S.S.G. § 5K2.7 states:

If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.

■■■ U.S.S.G. § 2P1.1 does not consider any adjustment for the disruption of a governmental function. In contrast, § 2P1.3 provides a base offense level of 16 for engaging in, inciting, or attempting to incite a prison riot if the offense involved a major disruption to the operation of an institution. We find, therefore, that the offense of escape or instigating or assisting an escape does not adequately take into account disruption of a governmental function. We further find that such disruption in the present case is factually supported by the record. The appellants attempt to minimize the disruption to the operation of MCC, citing only a delayed airlift of prisoners, a lockdown of the facility, and an extra count of prisoners. We agree with the United States that governmental response to this escape attempt involved much more. Present at the crash scene were local, state, and federal law enforcement personnel, paramedics, a Dade County Medivac helicopter, and firefighting equipment and personnel. The actions necessary to respond to the crash of a helicopter inside the prison grounds with an escaping prisoner on board disrupted the operation of MCC far beyond the level of disruption contemplated by a run-of-the-mill escape attempt. The district court based its three-level departure on the difference between the base level of 13 provided by U.S.S.G. § 2P1.1(a)(1) and that of 16 provided by § 2P1.3(a)(2). We find the departure reasonable.

### 4. *Endangerment to public welfare*

U.S.S.G. § 5K2.14 states:

If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

■■ The appellants argue, in essence, that since they hurt no one but themselves, the district court erred in departing on this basis. They rely on a portion of U.S.S.G. § 1B1.3, Application Note 4, which states that "[u]nless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred." The next sentence of Application Note 4 indicates, however, that actual danger is not required. "When not adequately taken into account by the applicable offense guideline, creation of a risk may provide a ground for imposing a sentence above the applicable guideline range." *Id.* We find that flying a helicopter into a small, fenced, occupied prison exercise yard created a risk that provides a ground for upward departure in this case. Such a stunt was potentially dangerous not only for Ben Kramer and Stevens, for whom the risk of harm became a reality, but also for the other inmates and prison officials in the exercise yard. The record reflects the hazards posed by this escape attempt. Even though fortuitous circumstances allowed all but the perpetrators to escape potential injury or death, we see no reason to allow the appellants to be rewarded for the creation of the risk to the remaining occupants of MCC. The guidelines provide, as specific offense characteristics for a number of crimes against a person, a two-level increase for bodily injury, a four-level increase for serious bodily injury, and a six-level increase for permanent or life-threatening bodily injury. *See, e.g.,* U.S.S.G. §§ 2A2.2, 2B3.1, 2E2.1. Since life-threatening bodily injury was a possibility in this case, we find the district court's four-level departure on the basis of

the risk of serious bodily injury to be reasonable.

### 5. Reasonable foreseeability

■ The appellants argue that the foregoing ten-level departures were erroneous because the consequences of the escape attempt were not reasonably foreseeable. Marren places added emphasis on this argument because of his limited involvement in the conspiracy.

U.S.S.G. § 1B1.3, Application Note 1, states:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

In determining relevant conduct, U.S.S.G. §§ 1B1.3(a)(1) and (3) state that the district court should consider:

> (1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
>
> \* \* \* \* \* \*
>
> (3) all harm that resulted from the acts or omissions specified in subsection[ ] (a)(1) ... above....

The appellants knew that the escape attempt involved aircraft and entry into a federal prison. Common sense indicates that such an operation has the potential for significant risks. Even though Marren's role was actively limited to introducing Stevens to Marc Kramer, Marren knew the type of escape being planned, for he chose Stevens not only because he had a pilot's license, but because he was known as a daredevil. We find that not only the crash, but also the resulting property damage, disruption of governmental functions, and endangerment of the public welfare, were reasonably foreseeable as to all appellants.

### B. Adjustments applicable to individual appellants

We now turn to the adjustments made by the district court which are applicable to individual appellants.

### 1. Leadership role in the offense

■ The Kramer brothers both received a four-level increase based upon their primary roles in the offense. U.S.S.G. § 3B1.1 states:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The guidelines also provide that there can be more than one person who qualifies as a leader or organizer of a criminal conspiracy. U.S.S.G. § 3B1.1, Application Note 3.

The district court's determination of a defendant's role in the offense is reviewed under the clearly erroneous standard. *United States v. Sellers*, 906 F.2d 597, 605 (11th Cir.1990).

Marc Kramer argues that the district court erred in evaluating his role in the offense. He claims that he was a relatively minor participant who served only as his brother's messenger. The United States contends that Marc Kramer supervised Stevens' activities, provided him with all necessary cash, engaged in frequent coded telephone conversations with his brother, and directed the escape operation from the outside. Both Kramers argue that, at least, the district court should have departed only two levels instead of four.

We cannot say that the district court's factual findings regarding the roles played by the Kramer brothers in this offense are clearly erroneous, and therefore, will not disturb the district court's decision to apply a four-level increase on this basis.[8]

### 2. *Obstruction of justice*

In Marc Kramer's PSI, the probation officer included allegations from Stevens that Marc Kramer threatened Stevens and his family early in the planning stages for the escape if Stevens failed to carry through, and again when both men were in prison awaiting trial for this offense. Marc Kramer denied the allegations at the sentencing hearing. Stevens did not testify. At the hearing, the district court stated its belief that Marc Kramer had made the threats against Stevens, notwithstanding the fact that Stevens did not testify at sentencing,[9] and increased Marc Kramer's offense level by two for obstruction of justice. Marc Kramer argues that the district court's reliance on Stevens' hearsay statements in the PSI without requiring proof of the allegations at the sentencing hearing was error, relying on *United States v. Christopher*, 923 F.2d at 1556–57. In *Christopher*, however, the district court sentenced the defendant without making factual findings as to the factual questions that Christopher disputed. In the present case, Marc Kramer was given the opportunity to rebut the statements made by Stevens which were included in the PSI, but the district court resolved the disputed factual issues against Kramer.

 Case law from this circuit clearly permits a district court to consider reliable hearsay evidence at sentencing. *United States v. Query*, 928 F.2d 383, 384–85 (11th Cir.1991) (findings of fact made by the district court in reliance on hearsay statements contained in a co-conspirator's PSI not erroneous). *See also United States v. Castellanos*, 904 F.2d 1490, 1496 (11th Cir.1990) (hearsay statements may be considered at sentencing so long as the

defendant has "the opportunity to rebut the evidence or generally to cast doubt upon its reliability"); *United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir.1990) (upward departure may be justified "solely on the basis of information contained in a presentence investigation report"). Furthermore, U.S.S.G. § 6A1.3 provides that a sentencing court may rely on "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

 Marc Kramer also relies on U.S.S.G. § 3C1.1, Application Note 2, which states that "suspect testimony and statements should be evaluated in a light most favorable to the defendant." The Fifth Circuit has held, however, that the guidelines do not require the sentencing judge to believe a defendant whenever he chooses to testify. In *United States v. Franco-Torres*, 869 F.2d 797 (5th Cir.1989), the defendant's word that he did not shoot at an agent was pitted against the agent's word that he did shoot. The sentencing judge chose to credit the agent's testimony, and the Fifth Circuit affirmed. 869 F.2d at 800–01. We agree with the Fifth Circuit that to construe Application Note 2 to require the sentencing judge to credit a defendant's testimony "would effectively enable every defendant to nullify its application by self-serving testimony." 869 F.2d at 801. Application Note 2 simply instructs the district court, after weighing the evidence, to resolve in favor of the defendant those conflicted issues about which the district court has not reached a definite conclusion. *Id.*

 The district court's determination that a defendant has obstructed justice is a factual finding which must be affirmed unless it is clearly erroneous. *United States v. Cain*, 881 F.2d 980, 982 (11th Cir.1989) (per curiam). After weighing the evidence,

---

**8.** The Kramers also argue that the district court's assignment of a four-level increase for their roles in the offense is duplicative of its departure for more than minimal planning. We see no merit to that argument.

**9.** We note that the district court had an opportunity to evaluate Stevens' credibility as a witness when he testified at Marren's trial.

the district court determined that it believed that Marc Kramer had made the threats against Stevens. We cannot say that the district court's finding that Marc Kramer obstructed justice was clearly erroneous. In fact, we agree with the district court that the enhancement of Marc Kramer's base offense level on that basis was warranted.

### C. *Adherence to procedure*

 The appellants contend that the district court erred because it did not engage in a step-by-step analysis of the extent of the departures, evaluate the reasonableness of the departures, articulate reasons for the departures, or resolve factual disputes. Our review of the record indicates otherwise.

The district court's comments reflect its assessment of the type of escape attempted in this case and the resulting consequences of the attempt. It is clear that the district court analyzed the extent of all departures and enhancements, as well as the reasonableness of each. Pursuant to 18 U.S.C. § 3553(c), the district court articulated its reasons for departing upward on each of the four departure grounds applicable to all appellants and on those enhancements applicable to certain individual appellants. The district court also resolved the factual disputes underlying the departures and enhancements as required by Fed.R.Crim.P. 32(c)(3)(D), finding in favor of the appellants on the issue of property damage and against them on all other disputed issues. We find no reversible error in the procedure followed by the district court in sentencing the appellants.

 The appellants also argue that the district court did not resolve all of the disputed facts or state that it was not relying on the disputed facts in sentencing. The record indicates the district court's resolution of factual disputes was adequate. Rule 32(c)(3)(D) requires that "when a defendant challenges a factual assertion in a PSI, the court must either make a finding as to the allegation or determine that no such finding is necessary because the matter controverted will not be taken into ac-

count in sentencing." *United States v. Lopez,* 907 F.2d 1096, 1101 (11th Cir.1990). In either event, a "written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons...." Rule 32(c)(3)(D). The United States acknowledges that the district court's findings of record have not yet been made a part of the PSIs pursuant to Rule 32(c)(3)(D). The failure of the district court to append a written record of its findings is a ministerial matter, however, which can be remedied on remand without resentencing. *Lopez,* 907 F.2d at 1101 n. 7. On remand, the district court can rectify its error by attaching a copy of the relevant sentencing hearing transcript pages to each appellant's PSI.

### D. *Dismissal of incorrect count*

Marc Kramer's plea agreement called for the dismissal of Count 4 if Ben Kramer pled guilty to the charges against him. At sentencing, the district court dismissed Count 3. On remand, the district court is directed to correct Marc Kramer's Judgment and Commitment Order to reflect his plea of guilty to Count 3 and the dismissal of Count 4.

### E. *Other sentencing issues*

All appellants but Stevens objected to the consecutive sentences imposed by the district court. The Kramers also argue that the district court improperly denied their request for *Brady* [10] material at sentencing, and Ben Kramer contested the imposition of a stand-committed fine. We see no merit to any of these issues, and see no need to address them.

### V. CONCLUSION

For the foregoing reasons, we affirm Marren's conviction and the sentences imposed upon all of the appellants. The case is remanded to the district court for the purpose of attaching a writing to each appellant's PSI in compliance with Fed. R.Crim.P. 32(c)(3)(D) and for correcting

---

**10.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Marc Kramer's Judgment and Commitment Order.

AFFIRMED and REMANDED with directions.